IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MADISON OSLIN, INC.,              *
et al.,
                 Plaintiffs       *

                 vs.              *   CIVIL ACTION NO. MJG-12-3041

INTERSTATE RESOURCES, INC.,       *
et al.,
                 Defendants       *

*       *       *       *       *       *       *       *       *

MEMORANDUM & ORDER RE: SUMMARY JUDGMENT

The Court has before it Defendants' Interstate Resources

and Interstate Corrpack's Motion for Summary Judgment on

Plaintiffs' Contract Claims [Document 76], Motion of Defendants

James Morgan and John Cristos for Summary Judgment on Fourth

Cause of Action (Trade Secret Claim) [Document 78] and the

materials submitted relating thereto.[1]  The Court has held a

hearing and has had the benefit of the arguments of counsel.


I.   BACKGROUND

     A.   Parties

     Plaintiffs, Madison Oslin, Incorporated ("Madison Oslin")

and Madison Oslin Research, Inc. ("Oslin Research")

---

[1]     The Court also has before it Plaintiffs' Motion to Strike
and Exclude the Opinions, Testimony, Report, and Declaration of
Defendants' Expert, Joel Kendrick [Document 81], a motion that
is mooted by virtue of the grant of summary judgment to
Defendants.

(collectively, "Oslin" or "Plaintiffs") are Alabama corporations involved in the paper coating and corrugated box industry.

Defendant Interstate Resources, Inc. ("Interstate") is a Virginia corporation and the parent company of several companies in the paper and packing industries that make paper, corrugated containers, and related products. Defendant Interstate Corrpack, LLC ("Corrpack")[2] is a Maryland subsidiary of Interstate that produces and sells corrugated boxes and sheets.

Defendant James Morgan ("Morgan") is President and Chief Operating Officer of both Interstate and Corrpack. Defendant John Cristos ("Cristos") was, during the relevant time at issue, the general manager of an Interstate affiliate.

B.   Procedural Posture

Plaintiffs filed this case in an Alabama state court asserting claims in twelve counts[3] against eight named Defendants[4] and six "John Doe" Defendants. On March 15, 2011,

---

[2]   Named in error as Interstate Cambridge Container LLC.

[3]   Conversion, Fraudulent Concealment, Unjust Enrichment, Misappropriation of Trade Secrets, Breach of Fiduciary Duty, Breach of Contract, Breach of Implied Duty of Good Faith and Fair Dealing, Misrepresentation, Suppression, Tortious Interference with a Business Relationship, Breach of Implied Contract, and Injunctive Relief.

[4]   Four remain as defendants: Interstate, Corrpack, Morgan, and Cristos. Plaintiffs voluntarily dismissed all claims against four former defendants, American Inks and Coating Company, Inc.,

the Northern District of Alabama dismissed the claims in all

Counts other than:

- Count 4 – Misappropriation of Trade Secrets – against Interstate, Corrpack, Morgan, and Cristos.

- Count 6 – Breach of Contract – against Interstate.

- Count 7 – Breach of Implied Duty of Good Faith and Fair Dealing – against Interstate.

- Count 11 – Breach of Implied Contract – against Interstate and Corrpack.

By the instant motions, Defendants seek summary judgment on

all claims in the remaining four Counts.


II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the

pleadings and supporting documents "show[] that there is no

genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).

The well-established principles pertinent to summary

judgment motions can be distilled to a simple statement:  The

Court may look at the evidence presented in regard to a motion

for summary judgment through the non-movant's rose-colored

glasses, but must view it realistically.  After so doing, the

Progressive Coatings, Inc., Mosely Holdings, Inc., and Jerry L. Mosely.

essential question is whether a reasonable fact finder could

return a verdict for the non-movant or whether the movant would,

at trial, be entitled to judgment as a matter of law.  See,

e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  Thus,

in order to defeat a motion for summary judgment, "the party

opposing the motion must present evidence of specific facts from

which the finder of fact could reasonably find for him or her."

Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999)

(emphasis added).

When evaluating a motion for summary judgment, the Court

must bear in mind that the "summary judgment procedure is

properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole,

which are designed 'to secure the just, speedy and inexpensive

determination of every action.'"  Celotex, 477 U.S. at 327

(quoting Rule 1 of the Federal Rules of Civil Procedure).


III. DISCUSSION

    A.   Prior History

    At all times relevant hereto, producers of meat products,

including chicken, have often shipped their products in

corrugated boxes cooled by ice.  In the 1990's, and earlier, manufacturers of these boxes traditionally used paraffin wax to impregnate the box because it had near-perfect water holdout properties.  However, wax boxes were expensive to produce and are not recyclable, requiring costs for their disposal.

In about 1998, Oslin developed an original idea of using a polyester coating to create a recyclable corrugated box as an alternative to wax-coated boxes.  Oslin says that it was the first company to pass the Fibre Box Association ("FBA") recyclability protocol[5] with its recyclable corrugated box. In 2000, Oslin Research obtained process and apparatus patents[6] for applying polyester coating to rolls of paper board to create a recyclable corrugated box.

By the 2000's, Interstate became interested in producing and marketing a recyclable corrugated box for sale to its customers in the poultry and produce industries and began researching recyclable wax-alternative coatings.  Its attempts were unsuccessful.  Its supplier of coating materials, Scott Seydel ("Seydel"), knowing of Oslin's efforts with polyester coatings, referred Interstate to Oslin.

---

[5]    In the early 1990's, the FBA released a recyclability protocol in an attempt to help recyclable box products enter the marketplace and to standardize testing of recyclable boxes.
[6]    Patents No. 6,113,981 (process) ("Patent '981") and No. 6,554,889 (apparatus) issued in 2000.

B.   The Parties' Interactions

In October 2007, Interstate representatives met with Oslin representatives for dinner in Birmingham, Alabama and discussed a possible joint venture relating to corrugated box coating.

The next day, the representatives met at Oslin's facility to look at the process and samples of Oslin's coating.  However, Oslin's paper-coating machine was not operational, needing an overhaul.  Interstate agreed to pay to get Oslin's facility and paper-coating machine operational so that they could run a trial and test the boxes produced.

The first trial was run in March 2008 on the refurbished machine at Oslin's facility.  The parties hoped to produce icepack boxes that could hold their shape without any internal lining when packed with forty pounds of chicken and twenty pounds of ice.

Oslin coated Interstate's paper. The treated paper was shipped to Corrpack and used to make trial icepack boxes.  A second trial occurred a month later and the trial boxes were sent to one of Interstate's customers, Mountaire Farms ("Mountaire") for testing.  In Mountaire's and Interstate's view, the trial boxes failed.[7]  Mountaire declined to participate in any further trials.

---

[7]   Reportedly, the bottoms of the boxes absorbed water, and

Thereafter, the parties conducted no further trials together, although they continued to discuss possible joint ventures.  Interstate, however, continued to engage in independent research towards producing a wax-alternative recyclable box. It ran trials with another offline coater, and considered a number of different coating providers.

Interstate ultimately produced boxes using a process different from that used by Oslin.  Oslin used an offline process in which the coating, impregnation, and corrugation of liner are separate processes, often done in separate locations. Interstate, however, used an inline process, whereby impregnation, coating, and corrugating occur in a continuous, multi-step process on a single production line.  Interstate filed a patent application for its inline process in January 2009, and in February 2009, the FBA certified Interstate's product as recyclable.

On March 20, 2009, Oslin and Interstate met together with an equity funding group in Washington, D.C.  Oslin alleges that this is when it learned that Interstate had been trying to create its own coating and had some success although not with

_____

the boxes released debris into the box's contents. These were both serious problems that would potentially subject a food packager to rejection of shipment and penalties.  The lab results were also unacceptable. In its Complaint, Oslin alleges that the trials were successful. Compl. ¶ 22.

the icepack boxes.  At a follow-up meeting in June 2009, Oslin
states that Interstate told it for the first time that
Interstate did not want to use Oslin's coating for icepack boxes
but suggested that Oslin create a compostable box. In January
2011, Interstate began advertising that it had created a
recyclable corrugated poultry box.


     C.   <u>Plaintiff's Claims</u>

In the now pending Counts, Plaintiffs assert claims based
upon Defendants' alleged theft of trade secrets related to the
process for creating a wax-alternative recyclable box and
infringement of a contract allegedly formed in October 2007,
requiring Interstate to enter into a joint venture.


     1.   <u>The Trade Secret Claims</u>

Plaintiffs' sued under the Alabama Trade Secrets Act.  The
parties agree that Alabama law applies to the claims in this
case.  The Alabama Trade Secrets Act defines a trade secret as
information that:

> a. Is used or intended for use in a trade or
> business;
>
> b. Is included or embodied in a formula,
> pattern, compilation, computer software,
> drawing, device, method, technique, or
> process;

c. Is not publicly known and is not
generally known in the trade or business of
the person asserting that it is a trade
secret;

d. Cannot be readily ascertained or derived
from publicly available information;

e. Is the subject of efforts that are
reasonable under the circumstances to
maintain its secrecy; and

f. Has significant economic value.

Ala. Code § 8-27-2.

Oslin has the burden to show that it had a trade secret as

defined by the Alabama code.  Pub. Sys., Inc. v. Towry, 587 So.

2d 969, 971 (Ala. 1991).  Oslin contends that its coating

process and its ability to instruct corrugating companies about

the proper methods of corrugating and heating the coated paper

are protectable trade secrets.

Oslin analogizes its claim to the claim made by the

plaintiff in Saunders v. Florence Enameling Co., Inc., 540 So.

2d 651 (Ala. 1988).  In Saunders, the Alabama Supreme Court

recognized – under the Restatement of Torts § 757 (1939) rather

than the Alabama Trade Secrets Act – that a process for coating

pipe could constitute a trade secret.  However, the Saunders

plaintiff was able to prove the process at issue was "not

publicly known."  Plaintiffs here cannot establish that element

of its claim.

In 1998, Oslin obtained U.S. Patents No. 6,113,981 (process) ("Patent '981") and No. 6,554,889 (apparatus) for applying polyester coating to rolls of paper board to create a recyclable corrugated box.  The patents disclosed, as was required for their validity, enough about the process to enable someone skilled in the art to duplicate it.  Thus, the contents of the patent are public knowledge and cannot constitute trade secrets.

Oslin alleges that there are specific, technical aspects regarding the process that are proprietary and are not disclosed in the Patents.  In the Complaint they state:

> These specific, technical aspects include, but are not limited to[8]:  (1) the specific temperatures necessary to heat the coating; (2) the specific mixtures of materials to produce the coating; (3) the ability to mix the coating correctly and to do so consistently; (4) the ability to apply the coating to paperboard at the right consistency and (5) the ability to instruct corrugating companies about the proper methods of corrugating and heating the coated paper.

Compl. ¶ 19.

The first four of these "technical aspects" are disclosed in the process patent.  The specific temperatures necessary to heat the coating and the specific mixtures of materials to

---

[8]    Plaintiffs have not presented evidence regarding any other alleged technical aspects that could be trade secrets.

produce the coating are stated to be part of the coating process.  Hr'g Tr. 123:20-124:6.  Someone "skilled in the art" would undoubtedly have the ability to mix the coating correctly and consistently and apply the coating to paperboard at the right consistency "without undue experimentation" for the patent to be valid, which is presumed. <u>See</u> Patent '981 6:17-22, 8:2-3, 9:47-50.  These "technical aspects" are not trade secrets.

The remaining purported trade secret is "the ability to instruct corrugating companies about the proper methods of corrugating and heating the coated paper."  However, of necessity, Oslin provided this instruction to outsiders, its customers and prospective customers.  Oslin produced neither evidence, nor even a contention, that all of these disclosures were protected by confidentiality agreements.  Moreover, this "secret" method of instruction was described in open court in a previous lawsuit and documented in a video presented to the public on YouTube.

Certainly, as Oslin contends, there can be cases in which a genuine issue of material fact exists regarding the status of certain information as a trade secret.  <u>Peat, Inc. v. Vanguard Research, Inc.</u>, 378 F.3d 1154, 1158 (11th Cir. 2004) (citations omitted).  However, the instant case is not one of these.  There is no evidence adequate to enable a reasonable jury to find that

the purported trade secrets were secret at any time relevant to

the instant case.[9]

Accordingly, Defendants shall be granted summary judgment

on Plaintiffs' trade secret claims.


### 2.   Contract Claims

Oslin contends that an oral contract was formed on October

7, 2007 at the dinner meeting in Birmingham, Alabama.  Pls.'

Opp'n 6-7, ECF No. 83.  Defendants contend (1) that an agreement

was never formed because there was never any mutual assent to

essential terms, and (2) even if there had been an agreement, it

was oral so that the Statute of Frauds would bar Oslin's claims.

The Court agrees with Interstate and shall grant summary

judgment on Oslin's contract claims.


### a.   Absence of Agreement

"No contract is formed without an offer, an acceptance,

consideration, and mutual assent to terms essential to the

contract."  Steiger v. Huntsville City Bd. of Educ., 653 So. 2d

975, 978 (Ala. 1995)(citing Strength v. Alabama Dep't of Fin.,

---

[9]   The Court notes that there are also serious questions
presented regarding whether any information was
"misappropriated" or whether the claim was brought within the
statute of limitations period.  These issues, however, do not
need to be addressed since Oslin cannot establish that it had a
trade secret to be protected.

622 So.2d 1283, 1289 (Ala. 1993)).  "[A]n implied contract must contain all of the essential elements of an express contract. . . . The elements of a contract are: (1) agreement; (2) consideration; (3) two or more contracting parties; (4) legal object; and (5) capacity." <u>Freeman v. First State Bank of Albertville</u>, 401 So. 2d 11, 13 (Ala. 1981).

The evidence relied upon by Oslin consists of nothing more than statements by Oslin and Interstate referring to a possible joint venture.  The statements made by both sides unambiguously establish that an agreement was never reached and that there was never mutual assent to the essential terms of any agreement. For example, after the dinner meeting, a conceptual outline was provided by Interstate, with a cover email stating: "This is not a 'proposal' or 'offer.'"  Mot. Ex. 1, ECF No. 76.  The outline stated that "[t]his is a working document and does not represent the positions or obligations of either party."  Mot. Exs. 2, 10.

In response, Oslin sent a communication to Interstate, stating: "We are flexible and want to arrive at an arrangement that Makes Sense for both of us . . . . A great deal of discussion needs to take place . . . ."  Mot. Ex. 3.

At the very most, the evidence would support a finding that the parties intended to reach an agreement in the future. However, under Alabama law, an agreement to agree at some point

in the future is not enforceable by a breach of contract claim.
Grayson v. Hanson, 843 So.2d 146, 150-51 (Ala. 2002).


          b.   Statute of Frauds

      Even if the parties had reached an agreement, it was not in writing and would be unenforceable by virtue of the Statute of Frauds.

      The Alabama Statute of Frauds provides, in pertinent part:

> In the following cases, every agreement
> is void unless such agreement or some note
> or memorandum thereof expressing the
> consideration is in writing and subscribed
> by the party to be charged therewith or some
> other person by him thereunto lawfully
> authorized in writing:
>
> (1) Every agreement which, by its terms, is
> not to be performed within one year from the
> making thereof;

Ala. Code § 8-9-2.  Therefore, if the putative oral agreement required performance beyond a one-year period, it was enforceable by Oslin only if memorialized in writing and signed by Interstate.

      Oslin states that there was an oral agreement[10] between the parties to form a joint venture, the object of which was to

---

[10]   Oslin further contends that the agreement was memorialized in a document that was initially emailed to Oslin on October 13, 2007 and then enhanced in November 2007.  However, Oslin agrees that the purported documents were never signed by Defendants so they do not represent a "writing" that would satisfy the Statute

create a wax-alternative, recyclable corrugated box that
Interstate would manufacture and sell for a 50/50 share of
profits.  Oslin argues that even if not likely or not intended,
the contract was "capable of performance within one year." Opp'n
19 (quoting Quimby v. Mem'l Parks, Inc., 667 So. 2d 1353, 1356
(Ala. 1995)).  Because the making and selling of a box could
have been completed within a year, or the contract could have
failed within a year, or Defendants could have fully paid Oslin
for the 50% ownership within a year, Oslin contends there is a
material question of fact that must be presented to a jury.  See
id. ("[W]hile it may not have been likely that the contract in
this case would have been performed within one year the contract
and the circumstances did not preclude its performance within
one year; thus a jury question is presented.")

However, when determining whether an oral agreement is
incapable of being performed within a year, a court must
consider all the contractual obligations over the entire life of
the agreement. See Hornady v. Plaza Realty Co., 437 So. 2d 591,
593 (Ala. Civ. App. 1983).  Certainly, the agreement was
"intended to be a long-term agreement."  See Mot. 21, ECF No.

---

of Frauds.  Hr'g Tr. 73:5-15.  A draft joint venture agreement
was drawn up, but not until 17 months after the October dinner
meeting when Oslin states the oral agreement was formed.  Mot.
Ex. 46, 3-4, ECF No. 76.

76, Ogilvie Dep. Ex. 8 at 295:1-12,294:3-8, 286:14-287:1;
Whatley Dep. Ex. 14 at 360:23-361:3, 320:13-21.

The record demonstrates that the purported oral agreement
would have required performance beyond a one-year period.  For
example, Oslin's November 2007 "deal points" document includes a
"fill in the blank" for Interstate's payment to Oslin of one
million plus a note for $5 million to be paid "$_____
(annually/quarterly/monthly) plus interest . . . ."  Defs.' Mem.
Ex. 1, ECF No. 77-1.  Plaintiffs testified that the agreement
was initially "a million down and then $5 million over four or
five years."  Defs. Mem Ex. 14, Whatley Dep. at 320:4-19.
Further, in its Complaint, Oslin alleges that it had been told
by Defendants of a requirement to fill orders "as early as the
first quarter of 2009."  Compl. ¶ 31.  The first quarter of 2009
is more than a year past October 7, 2007, the date on which the
purported oral agreement was reached according to Oslin.

Further, there were outstanding obligations from both
parties to the alleged agreement.  Certainly, Interstate never
paid the $6 million.  Oslin argues that it fully performed by
providing technology, operational know-how and expertise.
However, according to its own "deal points" document, Oslin was
also to license the patents, which it did not.  Defs.' Mem. Ex.

16

1, ECF No. 77-1.  The "contract" was, therefore, executory.
See Ex parte Ramsay, 829 So. 2d 146, 155 (Ala. 2002).

Oslin contends that Interstate represented to third
parties, for marketing and funding purposes, that a joint
venture existed.  Oslin seeks to rely on Conway v. Andrews to
support its contention that Interstate is estopped from using
the Statute of Frauds defense. 236 So. 2d 687, 692 (1970) ("It
is generally acknowledged in Alabama that the Statute of Frauds
may be waived by an affirmative act showing intention to affirm
the contract and bringing an action based on the unsigned
document is such an affirmative act.").

Oslin misconstrues the estoppel waiver described in Conway.
A party surrenders its right to assert a Statute of Frauds
defense if it has taken "an affirmative act showing intention to
affirm the contract," such as when the party who seeks to assert
the defense has itself brought suit on the unsigned agreement.
Durham v. Harbin, 530 So. 2d 208, 214 (Ala. 1988) (quoting
Conway, 236 So.2d at 692).  Interstate has not taken any such
action.

Accordingly, if there were an oral agreement as alleged by
Oslin, it would not have been enforceable by virtue of the
Statute of Frauds.

IV.   <u>CONCLUSION</u>

For the foregoing reasons:

1.   Defendants' Interstate Resources and Interstate
     Corrpack's Motion for Summary Judgment on
     Plaintiffs' Contract Claims [Document 76] is
     GRANTED.

2.   Motion of Defendants James Morgan and John
     Cristos for Summary Judgment on Fourth Cause of
     Action (Trade Secret Claim) [Document 78] is
     GRANTED.

3.   Plaintiffs' Motion to Strike and Exclude the
     Opinions, Testimony, Report, and Declaration of
     Defendants' Expert, Joel Kendrick [Document 81]
     is DENIED AS MOOT.

4.   Judgment shall be entered by separate Order.


SO ORDERED, on <u>Wednesday, March 25, 2015</u>.


                         _____/s/_____
                         Marvin J. Garbis
                         United States District Judge